IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 6, 2019

**STATE OF TENNESSEE v. JONATHAN MICHAEL ATHA**

**Appeal from the Circuit Court for Sevier County**
**Nos. 20183, 20185     Rex Henry Ogle, Judge**

**No. E2018-00663-CCA-R3-CD**

The Defendant, Jonathan Michael Atha, was convicted by a jury of two counts of aggravated rape, four counts of aggravated robbery, and three counts of aggravated kidnapping, for which he received an effective sentence of fifty years' incarceration. On appeal, the Defendant argues (1) that the trial court erred by denying his motion to suppress the victims' in-court identifications of the Defendant; (2) that the trial court erred by declining to issue a limiting jury instruction regarding the State's failure to preserve evidence; (3) that the trial court erred in ordering the Defendant to serve consecutive sentences for aggravated rape; and (4) that the cumulative effect of these errors deprived the Defendant of a fair trial. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

William L. Wheatley, for the appellant, Jonathan Michael Atha.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Jimmy Dunn, District Attorney General; and George C. Ioannides and Timothy Norris, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND [1]

This case arises out of two October 14, 2014 incidents. The first incident, a robbery, occurred at Sunset Cottage Rentals in Pigeon Forge and involved three victims,

---

[1] The Defendant has not raised sufficiency of the evidence as an issue on appeal. We will, therefore, confine our summary of the facts to those necessary to give context to the issues presented for review.

C.B., C.L., and D.F.[2]  The second incident, a robbery and subsequent rapes, occurred at a massage therapy business in Seymour and involved two victims, A.D. and A.R.

On March 2, 2015, a Sevier County grand jury indicted the Defendant in case number 20183 on two counts of aggravated rape, a Class A felony, and two counts of aggravated robbery, a Class B felony, and in case number 20185 on three counts of aggravated robbery, a Class B felony, and three counts of especially aggravated kidnapping, a Class A felony.[3]  See Tenn. Code Ann. §§ 39-13-502, -402, -304.  The two cases were consolidated for trial by agreement of the parties.

## A.  Pretrial Ferguson Motion

The Defendant filed a motion for dismissal of the indictments pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999) or, in the alternative, a limiting jury instruction. The motion stated that when officers were investigating the Sunset Cottage Rentals robbery, they spoke to an unidentified witness at a nearby hotel who told them she had seen an individual matching the suspect's description running down River Road just after the robbery occurred.  The Defendant argued that the failure to preserve the witness's name and contact information hindered the defense from uncovering unspecified potentially exculpatory evidence regarding identity.

At the motion hearing, Pigeon Forge Police Officer Toby Hilty testified that on October 14, 2014, he and his police dog tracked a suspect from Sunset Cottage Rentals toward a river.  Pigeon Forge Police Officer Matthew Shults also testified, but he did not recall having spoken to any witnesses during his investigation.  A recording of police radio "chatter," which was not included in the appellate record, was played for the trial court.

The trial court found that a witness telling an officer the direction in which a suspect ran did not require the officer to stop and take a statement from the witness.  The court denied the motion.

## B.  Pretrial Motion to Suppress

The Defendant filed a motion to suppress the victims' in-court identifications of the Defendant.  In the Sunset Cottage Rentals case, the Defendant argued that the three

---

[2] The practice of this Court is to refer to the victims of sexual offenses by their initials. This case presents several crimes, some of a sexual nature and others that are not sexually related. We have decided to use initials for all victims in this case in order to be consistent and protect the privacy of the victims of the sexual offenses; moreover, the sexual offense victims' full initials are sufficiently identifying that we will use only their first and middle initials.

[3] Before trial, the State dismissed Count 2, the aggravated robbery of D.F.

victims were all shown a video recording or still photograph after completing lineups and that this "confirmation" of the perpetrator's identity may have influenced their memory of events, thereby tainting all subsequent identifications. In the massage therapy business case, the Defendant argued that the photographic lineup was unduly suggestive because only two of the six individuals had blue eyes, which was the main descriptor given by A.R.

### 1. Sunset Cottage Rentals In-Court Identifications

At the suppression hearing, D.F. testified that she was self-employed and owned a marketing and advertising company. Sunset Cottage Rentals was one of her clients. On October 14, 2014, she entered the Sunset Cottage Rentals office around 10:00 a.m. D.F. called out a greeting when she "[caught] something out of the left side of [her] eye," turned, and saw a man "totally covered up except for his nose." The man wore "great big glasses," a hood, "something across his face," and dark clothing. The glasses had a reflective coating and were opaque. D.F. did not remember whether the man wore gloves, but because she did not remember seeing his hands, she surmised that "he was wearing gloves."

The man told D.F. to go into a back room, pointed a gun at her, and told her he would shoot her if she did not comply. D.F. looked at the man's face for twenty or thirty seconds before he pointed the gun at her, and she continued to do so after the gun was aimed at her. She noted that the gun was in line with the man's face and that as a salesperson, she always focused on other people's faces. D.F. was in the man's presence about two minutes in total and did not see any distinguishing characteristics other than that he "slouched."

D.F.'s October 14, 2014 written police statement was received as an exhibit. In it, she described the man as wearing "large black sunglasses, a [b]lack hoodie that covered his hair and a black scarf or sweater pulled up that covered his mouth area." D.F. acknowledged that she did not describe the man's face in her written statement.

On October 16, D.F. met with Pigeon Forge Police Detective David Joyner alone in a closed room at Sunset Cottage Rentals to complete a photographic lineup. D.F. had not seen any surveillance photographs or news reports regarding the crime before completing the lineup. D.F. told Detective Joyner that she was unsure if she could help him because all she saw was the man's nose. Detective Joyner asked her to look at the photographs and said that it was "okay" if she could not identify anyone. He allowed D.F. to cover the photographs with spare paper at her desk to reflect the way the man's face had been covered.

D.F. identified the Defendant and noted that it was "very obvious which one was the person [she] saw that day." She was "positive" in her identification. Detective Joyner did not comment on D.F.'s choice and asked her to sign underneath the photograph. He then showed D.F. a photograph of a gun and surveillance footage from a nearby Food City grocery store. D.F identified the man in the recording as the Defendant.

The recording was played for the court and was time-stamped 10:19:35 a.m. on October 14, 2014. In it, a white man wearing a black hooded sweatshirt with the hood raised, blue jeans, and brown boots walked by the front of the store. The recording showed front and rear angles. The man had an uneven gait that caused him to sway from side to side.

D.F. was shown October 14, 2014 surveillance photos from the parking lot of Sunset Cottage Rentals, which were blurry and depicted a white vehicle and a person wearing a light-colored shirt in the parking lot. The time stamp on the photographs was 10:18 a.m. D.F. drove a white SUV, but she did not typically park in the area where the white vehicle appeared in the photograph. She wore black pants the day of the robbery and did not remember which shirt she wore, although she noted that she seldom wore light-colored shirts.

C.L. testified that about 10:00 a.m. on October 14, 2014, a man entered her workplace at Sunset Cottage Rentals with a gun and demanded money from their cash boxes. The man was present for six or seven minutes. The man pointed a gun at C.L. as she opened her cash box. The man wore black opaque sunglasses and a "black scarf type thing," which covered part of his face. The man forced C.L. and C.B. into a back room and threw other cash boxes to the floor to open them. During this process, the scarf fell down and the lower part of his face was uncovered for about two minutes. C.L. did not see facial hair or other distinguishing features, although she noted that she focused on the man's face and was afraid for her life. She saw the man's nose, mouth, chin, and the top part of his neck. C.L. did not recall whether the man wore gloves. She described the man's footwear to the police, although she did not include it in her first written statement. C.L. acknowledged that at a preliminary hearing, she testified that the man had a tattoo on his hand and clarified that she had not seen a tattoo.

Once C.L. and C.B. were in the back room, the man told them to undress while pointing the gun at them. C.L. and C.B. began to undress, and D.F. entered the office. The man left shortly thereafter. C.L. stayed in the parking lot the rest of the day, accompanied by family members and other coworkers. C.L. did not discuss the events with anyone else because she was "in shock." She did not look for information about the robbery on the Internet or see news reports regarding the robbery.

C.L.'s October 14, 2014 written police statement described a white man in his twenties who wore "dark blue jeans and a black fleece [z]ipup hoody[,] big black sunglasses[, and a] black fleece like thing around his neck and mouth[.]" A still photograph taken from interior surveillance recordings of the Sunset Cottage Rentals office, which were time-stamped 10:14 a.m. on October 14, 2014, showed a person with his or her face covered in black material, dressed in a black hooded sweatshirt and blue jeans and holding a gun in a gloved hand.

On October 16, 2014, C.L. completed a photographic lineup with Detective Joyner. Detective Joyner instructed C.L. before the lineup that the man may or may not have been pictured. C.L. identified a photograph of the Defendant in the lineup. She was "one hundred percent" certain the photograph she chose was of the man she saw, although she could not remember how long it took her to choose his photograph. C.L. denied having been shown any photographs prior to the photographic lineup.

After completing the lineup, Detective Joyner showed C.L. a still photograph from the Food City surveillance recording. Detective Joyner asked C.L. if the man in the photograph was the one she chose in the lineup. C.L. made another written statement in which she confirmed that the man in the still photograph was the person she saw.

C.B. testified that on October 14, 2014, she was working at Sunset Cottage Rentals when a man with a gun grabbed her arm, came through a side door, and demanded money. The man was tall, "skinny," and wearing a hooded sweatshirt, boots, a "facial mask," and aviator sunglasses. She estimated the encounter lasted six or seven minutes. C.B. testified that she could see the man's cheeks and nose "real[ly] well" but that his sunglasses obscured some of the front of his face. C.B. could see the man's eyes through the sunglasses but could not see his eye color. The man did not wear gloves, and C.B. did not recall if his hands had distinguishing features. C.B. denied that the man's mask fell down while he broke the cash boxes. C.B. could see the man's mouth as he spoke.

C.B.'s 9-1-1 call recording, which was not included in the appellate record, was played for the court. C.B.'s October 14, 2014 written police statement described the man as wearing a fleece jacket with a hood and big sunglasses. C.B. testified that she "was probably focused on big details" and did not think to describe the man's face. The only time she looked at the man's face was when he broke the cash boxes. C.B. acknowledged that her fear may have impacted her awareness of events. C.B. acknowledged that she had not mentioned the man's shoes in her first written statement, although her second written statement described brown work boots.

-5-

After the police arrived, C.B. sat outside the building with several other people. She discussed the event generally with her mother but did not discuss the man's appearance with anyone.

C.B. discussed the incident with C.L. and D.F. on October 14 but did not believe they discussed the man's appearance. She denied having been shown photographs before October 16, when Detective Joyner conducted a photographic lineup at Sunset Cottage Rentals. The victims were called in one at a time. Detective Joyner instructed C.B. to examine the photographs, but she did not recall whether he commented on the possibility that the man was not pictured.

C.B. took three minutes to identify the Defendant in the lineup because she used her hands to cover each photograph to mimic the way the Defendant was covered during the robbery. She reviewed all of the photographs to be sure she made the right choice. After C.B. chose a photograph, Detective Joyner thanked her and did not comment on her selection. After the lineup, the victims did not discuss who they had chosen, and they did not know they all chose the same person. Later that day, C.B. was shown a Food City surveillance recording and was asked whether the person in the recording was the man who robbed her. Although C.B. was not asked whether she identified the Defendant in the recording, C.B.'s second written statement was received as an exhibit and stated, "[W]ith [the Defendant's] features I felt very confident picking him out in a picture lineup and [t]he Food City [surveillance] we saw was the clothes he was wearing dark hoodie, brown work boots. Dark [b]ig [a]viator [g]lasses . . . also."

Former Pigeon Forge Police Detective David Joyner testified that on October 14, 2014, he investigated the Sunset Cottage Rentals robbery. He arrived at the scene between 10:30 and 11:00 a.m. and spoke to the responding officer and the three victims.

The Defendant was identified in the Food City surveillance recording by his father the evening of October 14. Detective Joyner returned to Sunset Cottage Rentals on October 16 to conduct photographic lineups with the victims. He interviewed each of them individually. His standard practice, which he followed in this case, was to tell each witness that the person who committed the crime may or may not be in the lineup, that no pressure existed to choose a photograph, and only to choose a photograph if the witness was certain.

Detective Joyner identified a copy of the lineup with his handwritten notations that each of the victims denied having seen the Defendant's photograph on television or newspapers and that each victim identified the Defendant in their respective lineups. He recalled that one or two of the victims covered portions of the photographs. Detective Joyner did not have the victims make a statement as to the certainty of their respective identifications because he had "never even seen that done."

-6-

After the lineups were complete, Detective Joyner showed the victims either the Food City surveillance recording or a still photograph from the recording on his cell phone. When asked why he showed the victims the recording after the lineups, Detective Joyner stated that the recording was relevant to identification in that it showed the Defendant's clothing and "very distinctive walk." Detective Joyner did not believe his showing the victims the recording reinforced their choices in the lineup.

Detective Joyner acknowledged that he had a federal conviction for attempted extortion occurring in 2009, for which he received a sentence of three years' probation. He resigned from the police department in December 2014.

Taylor Beebe, a former employee of Sunset Cottage Rentals, testified that on October 14, 2014, she stood in the parking lot after the robbery with several other individuals, including C.B. and C.L. While C.L. and C.B. were inside, a police officer showed Ms. Beebe a still photograph of a man from a nearby Food City surveillance recording. The man wore a hooded sweatshirt, and Ms. Beebe did not recognize him.

Steve Dixon, a former employee of Sunset Cottage Rentals, testified that when he arrived to work on October 14, 2014, people were standing outside the building, including C.B., C.L., and members of C.L.'s family. A police officer showed Mr. Dixon a blurry photograph of a person wearing a hooded sweatshirt taken from an overhead angle and asked if Mr. Dixon knew the person. Mr. Dixon told the officer that the person resembled a coworker named Justin with whom Ms. Beebe was better acquainted. To Mr. Dixon's knowledge, the photograph was not shown to anyone else.

Amanda Branam, a former employee of Sunset Cottage Rentals, testified that she was present on a day after the robbery during which a police officer questioned C.L. and C.B. An officer produced a photograph and said, "[T]his is the guy. Then one of the girls said, are you sure[?]" Ms. Branam was uncertain if this conversation occurred days or a week after the robbery.

Pigeon Forge Police Officer Scott Bull testified he was the first responding officer to Sunset Cottage Rentals on October 14, 2014, and that he obtained written and verbal statements from each victim. He obtained a description of the suspect from the victims and relayed it to police dispatch. A recording of Officer Bull's radio transmission, which was not included in the appellate record, was played for the court. The description was of a white man wearing blue jeans, a black fleece hooded sweatshirt, a black knit cap, a black turtleneck, and black sunglasses. Officer Bull did not leave the crime scene or speak to witnesses outside Sunset Cottage Rentals.

Relevant to the still photograph or surveillance recording shown to the victims after the lineups, the trial court found that any conflicts in testimony related to the weight

of the evidence and not admissibility. The court concluded that in the totality of the circumstances, the victims' identifications of the Defendant "were not the result of any inappropriate lineup in this case." The court found that the victims were in very close proximity to the Defendant during the robbery and had the opportunity to see his features. The victims' first lineup identification was "made promptly" and the victims' level of certainty was "pretty high[.]" The court further found that "any errors, if any, made in showing [the victims] the single photograph and/or the video [did not detract] from their identification." The court concluded that no violation of due process occurred and denied the suppression motion.

2. Massage Therapy Business Lineups

Sevier County Sheriff's Detective Maria Cutshaw testified that on October 14, 2014, she was the lead investigator on the massage therapy business case. On October 15, 2014, Detective Cutshaw asked A.D. and A.R. to come to the sheriff's department to complete a photographic lineup and see a video recording. She noted that because A.D. and A.R. were similar in appearance, she sometimes confused their names. A.D. and A.R. arrived together, A.D. sat in the lobby, and A.R. went to Detective Cutshaw's cubicle. A.D. and A.R. did not have cable television or access to social media, and they denied having seen any news coverage regarding the massage therapy business incident.

Detective Cutshaw read A.R. instructions from a document entitled "Eyewitness Evidence, A Guide for Law Enforcement," published by the United States Department of Justice. The document provided step-by-step instructions for investigators to give witnesses prior to completing a lineup. Detective Cutshaw made check marks beside each step as she gave the instructions to A.R. The instructions were as follows:

1. Instruct the witness that he/she will be asked to view a set of photographs.

2. Instruct the witness that it is just as important to clear innocent persons from suspicion as to identify guilty parties.

3. Instruct the witness that individuals depicted in lineup photos may not appear exactly as they did on the date of the incident because features such as head or facial hair are subject to change.

4. Instruct the witness that the person who committed the crime may or may not be in the set of photographs being presented.

5. Assure the witness that regardless of whether an identification is made, the police will continue to investigate the incident.

-8-

6. Instruct the witness that the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification.

A.R. identified the Defendant in the lineup and stated that she was "a hundred percent" certain. Detective Cutshaw then repeated the lineup instructions and showed A.R. the Food City surveillance recording. A.R. "immediately" identified the Defendant.

Detective Cutshaw led A.R. to the lobby and took A.D. to the cubicle. A.R. and A.D. did not speak or gesture as they passed. Detective Cutshaw repeated the same procedure with A.D., but she showed A.D. the Food City surveillance recording before completing the photographic lineup. A.D. identified the Defendant in the recording and the lineup and said she was one hundred percent certain.

Detective Cutshaw explained that she reversed the order in which she showed the recording and lineup to the victims so she could demonstrate the victims' ability to identify the Defendant in each context without having seen any previous images of him.

Detective Cutshaw acknowledged that the victims' written statements were emailed to her after the victims completed the lineups. Detective Cutshaw recorded A.D.'s verbal statement on October 14, but her recorder malfunctioned and did not record A.R.'s verbal statement.

Detective Cutshaw acknowledged that a properly constructed lineup featured people of similar physical characteristics. At the time this lineup was constructed, the Defendant had been identified as a suspect and Detective Cutshaw used the Defendant's characteristics to choose the other five photographs. Both victims had described a white man and an approximate height, and A.R. told Detective Cutshaw the man had blue eyes. In later conversations that were not recorded, both victims described the man's "very distinguished walk." Detective Cutshaw had noted after her initial review of the Food City recording that "the guy in the video had a peculiar walk just as the girls from the massage robbery had mentioned." When asked to review a copy of the lineup, Detective Cutshaw thought four or five of the six individuals had blue eyes.

A.R. testified that on October 14, 2014, she was with A.D. at their massage therapy business. Around 10:30 a.m., a man wearing a black hooded sweatshirt with the hood raised, "something to cover his face," aviator sunglasses, a gray "zip-up," whitewashed blue jeans, and brown work boots walked in with a gun. A.R. had been sitting in the lobby facing the door and saw the man as he entered. The man was about fifteen feet away from A.R., and she was wearing prescription eyeglasses. She thought they were in the lobby area with the man for eight to ten minutes. The man led the

victims into the massage room and searched for a light switch. A.D. suggested that they go into the bathroom if the man wanted a light.

They went into the bathroom, the man told the victims to undress, and he left. A.R. removed her eyeglasses during the process of undressing and did not have them on for the remainder of the incident. When the man returned, he was not wearing sunglasses. A.R. stared at the man and made eye contact for five to eight seconds before he replaced his sunglasses. A.R. estimated the man was two feet away, and she noticed he had "small light blue inset eyes" and a broad nose. Sun was coming through the window and "accentuated" A.R.'s view of the man's face. The man re-covered his face before directing the victims into the massage room and raping them. The massage room was dimly lit, and A.R. did not look at the man's face during or after the rape. She did not notice any distinguishing tattoos, scars, or marks on the man's body, although she noted that his pubic area was clean shaven and he wore dark blue boxer shorts with white stripes. The man left around 11:40 a.m.

When A.R. was asked why she did not include the man's facial features in her first written police statement, she stated that she was not concentrating on details and that her goal was to "get down as much as possible as fast as possible."

The next day, Detective Cutshaw interviewed A.D., and A.R. waited in the lobby. A while later, Detective Cutshaw brought back A.D. and asked A.R. to come with her. The victims did not exchange words or gestures as they passed one another. Detective Cutshaw told A.R. if she did not see the man in the lineup, she did not have to identify anyone. A.R. stated that "[her] eyes went directly to" the Defendant's photograph, that she reviewed the other photographs, and that she identified the Defendant and said, "It's him." After the lineup, Detective Cutshaw showed A.R. a video recording of a man walking in a parking lot. A.R. noted that the man in the recording wore the same clothing, except he lacked the gray zip-up hooded sweatshirt. She noted that the blue jeans looked the same in the recording as the ones the man wore.

Detective Cutshaw recorded A.R.'s verbal statement on October 14, and A.R. sent a typewritten statement a "couple of days" after the incident and after the photographic lineup. A.R. told Detective Cutshaw the man had blue eyes on "[t]he day that I identified him." She could not recall whether she gave Detective Cutshaw an eye color prior to this statement. A.R. noted that she told A.D. during the incident that she had seen the man's eyes, but they did not discuss the color. A.R. acknowledged that in her first written statement, she described "small inset light-colored eyes." She did not feel a need to specify the eyes were blue because light-colored eyes meant blue to her.

After the incident, A.D. and A.R. stayed at a cabin, which did not have cable or Internet. They discussed the incident but focused on their experiences and not the man's appearance.

A.D. testified that on October 14, 2014, she was self-employed at her massage therapy business, which she owned with A.R. Around 11:00 a.m., A.D. was on the telephone and A.R. sat in a chair in the lobby. A man wearing blue jeans, a black hooded sweatshirt with the hood raised, a gray zip-up jacket, a black "mask type thing," and aviator sunglasses entered the business, and A.D. hung up the telephone. The man demanded money and pulled out a gun. He wore black "leather-ish synthetic material" gloves. A.D. removed sixty-five dollars from a disguised cash box, which was all the cash they had on hand.

The man ordered the victims into the massage room and searched for a light switch. A.D. suggested going into the bathroom if the man wanted light, as the massage room did not have a light switch. The man led the victims to the bathroom at gunpoint. The sun shined on the man through a window near the bathroom door.

A.D. approached the man and suggested that she could go to a nearby bank and get him more money. A.D. noted that she was four feet, eleven and one-half inches tall and that the man was about six feet tall. The Defendant pushed A.D. backward and began patting down the victims in search of their cell phones. The Defendant ordered the victims to undress and left the bathroom, closing the door behind him.

When the Defendant returned, he was not wearing sunglasses. A.D. looked down for fear of what the man would do if he realized she had seen his face, but A.R. stared at the Defendant. A.D. continued to glance at the man's face. She noted, "He had, to me, a very definite defining face structure . . . . It was something that was very strong. I could see . . . the outline of him and the outline of his eyes even through his glasses, because they weren't mirrored." She noted, though, that she did not see the man's eye color. The Defendant led the victims into the massage room, and A.D. noted that the clock read 11:20 a.m. A.D.'s face was covered with a pillowcase for one minute during the incident, but the man helped her uncover her face. She kept her eyes open during a portion of the rape.

The man left around 11:34 a.m., and A.D. estimated the entire incident lasted between thirty and thirty-five minutes. A.D. called 9-1-1, and the recorded call was played for the court. In the recording, A.D. described the Defendant as being about six feet tall, of average build, and wearing aviator sunglasses, a gray sweatshirt with a black sweatshirt underneath covering his mouth, and blue jeans. A.D. acknowledged she described the man's "gray sweatshirt" and clarified that she called it a sweatshirt because it had a hood, explaining that it was a zip-up hooded sweatshirt.

When asked why she did not describe the man's face in her October 14, 2014 written statement, A.D. stated that she was overwhelmed and "just wanted to put the basic facts" of the robbery and rape. On October 15, A.D. and A.R. went to the sheriff's department to meet with Detective Cutshaw. Detective Cutshaw showed A.D. a recording and told her, "[I]f you see something familiar let me know, but if not don't worry about it." A.D. identified the Defendant in the recording as the man she saw on October 14. Detective Cutshaw responded by saying, "[O]kay."

Detective Cutshaw then repeated the same instructions and showed A.D. a photographic lineup. A.D. identified the Defendant in the lineup. When asked whether the recording influenced her choice in the lineup, A.D. responded negatively. She noted that she could not clearly see the man's face in the recording and that her identification relevant to the recording was based upon the man's clothing and his "distinctive" gait. She acknowledged, though, that the recording was the first time she saw the man's face.

When asked why she did not include a description of the man's face in her typewritten statement, A.D. replied that she tried to "remember the facts of what happened to me." A.R. later told A.D. that the man's eyes were the same color blue as the victims' father's eyes, but they did not discuss his appearance further.

The trial court found relative to the construction of the lineup that nothing "[stood] out in the photographic lineup that [was] suggestive." Relevant to A.D.'s viewing the surveillance recording before completing the lineup, the court concluded that it was suggestive. The court noted that it applied a totality of the circumstances test and concluded that A.D.'s lineup identification was not admissible.

## C. **Trial**

At trial, C.L. testified consistently with her suppression hearing testimony. C.L. identified the Defendant and described him as wearing a hooded sweatshirt, sunglasses, blue jeans, and a "black scarf type thing" covering part of his face. She did not think he wore gloves.

Six still photographs taken from security footage of the Sunset Cottage Rentals office interior contained time stamps of 10:14 a.m. to 10:17 a.m. on October 14, 2014. The photographs showed a person with his or her face covered in black material and dressed in a black hooded sweatshirt and blue jeans and holding a gun.

C.L. testified that she and C.B. unlocked their respective cash boxes and gave the Defendant the contents. The Defendant asked for "the other cash boxes" and broke open two cash boxes by throwing them on the floor. When the Defendant's scarf fell down, C.L. noted that the Defendant was clean shaven, and she did not notice any scars,

-12-

birthmarks, or tattoos. The Defendant then made the victims go into a back room and "told [them] to strip off all of [their] clothes."

C.L. identified an October 14, 2014 video recording from the Sunset Cottage Rentals security cameras, which was played for the jury. The recording, which contained 20-second gaps throughout, contained nine camera angles, some of which were outside and others that were inside the office building. The recording showed a person in black clothing entering the office and two women moving, sometimes with their hands up, accompanied by the person in black. The person in black entered a side room in the office, and a third woman entered the building lobby. C.L. identified a photograph of the type of gun the Defendant carried.

C.L. testified that when she and C.B. were in the back room, a part-time employee, D.F., entered the office. The Defendant told them to wait ten minutes before they "called anybody" and ran out of the office. C.B. called the police and C.L. described the Defendant to the police as a white male in his twenties. C.L. saw the Defendant's face when his scarf fell down but stated that his nose and upper lip were visible the entire time. Two days after the robbery, Detective Joyner came to the victims' workplace and conducted a photographic lineup with each of the three victims outside of the presence of the others. C.L. identified the Defendant in the lineup. She stated that she was "[o]ne hundred percent" certain the Defendant was the one who robbed her.

After C.L. completed the photographic lineup, Detective Joyner showed her a still photograph from the Food City surveillance recording, which was displayed for the jury. C.L. identified the Defendant in the recording. She recognized "his face, the lower part of . . . his hoody, the way he walked, [it] was all the same." C.L. acknowledged that after she saw this photograph, she gave another statement to police in which she added that the Defendant wore brown boots. She denied that seeing the still photograph improved her memory or "gave [her] details that [she] hadn't mentioned before[.]" C.L. identified the Defendant in court and noted that he had gained weight since the incident.

C.B. testified consistently with her suppression hearing testimony. C.B. added that the Defendant's mask covered his face aside from the cheeks, nose, and upper lip, and that the hood on the sweatshirt covered his eyebrows and forehead.

The 9-1-1 audio recording was played for the jury. C.B. identified the photograph of the gun as the one used by the Defendant. C.B. thought that she remembered the Defendant's hands having a tattoo. C.B. acknowledged her previous hearing testimony that she had not seen any scars or tattoos on the Defendant. She later reiterated that she had not seen a tattoo on the Defendant's hand. C.B. noted that she had been diagnosed with post-traumatic stress disorder. C.B. acknowledged that she had described the

Defendant's sunglasses as "women's sunglasses" in the 9-1-1 call, "big sunglasses" in her first written statement, and "aviator sunglasses" in her second written statement.

C.B. denied having seen photographs of potential suspects prior to completing the photographic lineup and stated that she was "[one] hundred percent" certain she identified the correct person. C.B. identified the Defendant in court and noted that he had gained weight since the incident.

D.F. testified consistently with her suppression hearing testimony. D.F. noted that although she could only see the Defendant's nose and another part of his face, she saw it "very well." She did not look at the gun long and instead examined the Defendant's face to determine if he was joking. The police did not show D.F. any photographs the day of the incident. D.F. did not see any news reports regarding the robbery or discuss it with any other individuals before the photographic lineup. D.F. identified the Defendant in court and noted that he had gained weight since the incident.

D.F. identified a second written statement given after she watched the Food City surveillance recording, in which she confirmed that the man in the video had the same clothes, "hoodie, jeans, and shoes," as the Defendant. When D.F. watched the video, she was asked to look at the man's clothing and could not see his face very well. D.F. did not remember any distinguishing characteristics of the Defendant's blue jeans or hooded sweatshirt.

Crystal Merry, a former romantic partner of the Defendant, testified that on October 15, 2014, she was at a friend's house with the Defendant when he was arrested. Ms. Merry had seen the Defendant with a BB gun or airsoft gun that "looked like a real gun" once or twice on the previous Friday. On October 14, she saw the Defendant at a mutual friend's house in the early morning hours. Ms. Merry did not see the Defendant again until late that evening. He was wearing a gray hooded sweatshirt, blue jeans, and tennis shoes. The Defendant used Ms. Merry's cell phone to access the Internet and check the news. He looked for news reports on robberies, although Ms. Merry later admitted she only saw news websites and not specific searches for robberies.

Ms. Merry testified that she and the Defendant had a sexual relationship, that his pubic hair was typically clean shaven, that he had a large penis, and that he used Magnum brand condoms, although he sometimes used smaller condoms. The last time Ms. Merry and the Defendant had sexual intercourse was the morning he was arrested, and his pubic area was clean shaven on that occasion.

Police officers showed Ms. Merry a video recording of a man and asked her if she recognized the man's clothing. Ms. Merry had never seen the Defendant wear the particular clothing in the recording. Ms. Merry noted that the Defendant had men's and

women's clothing in the trunk of his car, including "a hoody or two" and one pair of boots. Ms. Merry stated that the Defendant had gained weight since October 2014.

A.D. testified consistently with her suppression hearing testimony. She added that the Defendant had a distinctive gait or "swag" that in her professional experience was consistent with an "exaggerated shortened [quadratus lumborum]" muscle.

When the victims completely undressed, the Defendant led the victims into the massage room and told A.D. to get on the massage table and A.R. to go into the corner of the room. A.D. asked for permission to turn on a light and the Defendant agreed. A.R. stood near the massage table opposite A.D., and the Defendant put the gun to A.R.'s head and ordered her to go to the corner and put her hands on the wall. The Defendant told A.R. he would "blow [her ] f---ing face off" and not to turn around no matter what she heard.

A.D. laid face up on the massage table, and the Defendant covered her face with a pillow case. The Defendant uncovered A.D.'s face, threatened to shoot her if she bit him, and orally penetrated her with his penis. She noted that the Defendant's penis was large and she could not breathe due to its size. He wore a condom and his pubic area was clean shaven.

The Defendant pulled away from A.D. and ordered A.R. over to him and to kneel. A.D. heard a choking sound, turned toward A.R., and saw the Defendant orally penetrate A.R. with his penis. After the Defendant left, A.R. drove both victims to a nearby pharmacy, and A.D. called the police.

A.D. testified that during the rape, the Defendant pulled down his pants and underwear just below his penis. She did not notice any distinguishing marks, scars, or tattoos. His boxer shorts were blue with white vertical stripes. A.D. identified the gray hooded sweatshirt, boxer shorts, and gun in photographs from the house where the Defendant was arrested. A.D. noted that the gun she remembered looked like a "cop gun" or automatic handgun and that it looked real to her.

A.D. gave a recorded statement to Detective Cutshaw the same day, in which she told Detective Cutshaw that she did not know if the Defendant wore gloves. A.D. acknowledged that none of her written statements included a description of the Defendant's underwear. She said, though, that she called Detective Cutshaw two days after the crime and left a voice mail message describing the boxer shorts.

A.R. testified consistently with her suppression hearing testimony. A.R. noted that the Defendant's penis was large and she and A.D. both choked and could not breathe

when they were orally penetrated. The Defendant wore a condom and his pubic area was clean shaven.

A.R. testified that the Defendant wore "pleathery-leathery black dark . . . winter gloves" during the incident and that during the rape, the Defendant pulled his blue jeans around his hips and rolled down his boxer shorts below his penis. The boxer shorts were dark blue, and A.R. identified the photographed boxer shorts and gun as both belonging to the Defendant. A.R. acknowledged that she did not describe the boxer shorts in her written police statement. A.R. identified the Defendant in court.

Greg Atha, the Defendant's father, testified that in October 2014, police detectives came to his house and asked him to identify a man in photographs and a Food City surveillance recording. Mr. Atha identified the Defendant in the recording and still photographs based upon his head, face, and "very distinctive walk." Mr. Atha noted that he could identify the Defendant solely based upon his gait. He acknowledged that he was estranged from the Defendant.

Officer Scott Bull testified consistently with his pretrial hearing testimony.

Officer Toby Hilty testified consistently with his pretrial hearing testimony. He added that his police dog indicated that the person may have crossed a river into a campground, but the dog was unable to reestablish a path in the campground. Officer Hilty did not apprehend a suspect that day.

Pigeon Forge Police Detective Matthew Pendleton testified that he helped Detective Joyner investigate the Sunset Cottage Rentals scene and eventually took over the case. The detectives collected cash boxes, a telephone headset, a business-owned cell phone, and buccal swabs, which were logged as evidence with the police department.

Pigeon Forge Police crime scene specialist Wayne Knight testified that he was also responsible for maintaining evidence in the police department's custody. Officer Knight identified several pieces of evidence from the Sunset Cottage Rentals crime scene, including twelve DNA swabs and six physical items. None of the items were sent for laboratory testing because the surveillance video showed the suspect wore gloves the entire time. Without skin contact with the items in evidence, DNA testing would have been futile.

Detective Cutshaw testified consistently with her suppression hearing testimony. On October 14, 2014, she spoke to A.D. and A.R. and collected DNA swabs from their bodies and any items that may have been touched. Detective Cutshaw learned that the Defendant had worn gloves and as a result, the physical items from the crime scene were not tested for DNA. Although Detective Cutshaw acknowledged that A.D. or A.R.'s

-16-

saliva may have been present on the Defendant's boxer shorts, she had not requested that the shorts be tested, and the shorts were in the custody of another police department. Detective Cutshaw read from her October 16, 2014 report in which she noted that the victims described white boxer shorts with blue stripes. She stated, though, that in a subsequent telephone conversation, the victims described "blue and white boxer shorts." Detective Cutshaw was not sure whether she had been mistaken in her report.

Detective Cutshaw showed each of the victims a photograph of the Defendant's boxer shorts two weeks before the trial and separately from one another. Each of the victims began to cry upon seeing the photograph and, without being asked, identified them as the boxer shorts they saw during the rape. Detective Cutshaw stated that it could take between twenty minutes and "hours" to travel between Sunset Cottage Rentals and the massage therapy business depending on traffic congestion.

Angela Dunn testified that she knew the Defendant through a mutual friend, that the Defendant had been at a party at her house on October 10, 2014, and that the Defendant suddenly decided to leave and return to Knoxville. Ms. Dunn went on a trip on October 16, 2014, and had noticed one of her son's airsoft guns, a Taurus 24/7, was gone. She reported the gun as stolen on October 20, 2014. She identified her son's gun as the one recovered from the Defendant.

Taylor Beebe testified consistently with her suppression hearing testimony. She added that to her knowledge, none of the three victims were present when Ms. Beebe saw the photograph, and none of the victims were shown the photograph that day.

Steve Dixon testified consistently with his suppression hearing testimony. He added that the officer who questioned him called over Ms. Beebe and showed her the photograph. He did not see officers show C.B., C.L., or D.F. the photograph.

Amanda Branam testified consistently with her suppression hearing testimony.

Dr. Jeffrey Neuschatz, an expert in eyewitness identification, testified about how the brain creates memories and how memories can subconsciously change over time. Some factors in the accuracy of a memory are the amount of time a person is exposed to information, the opportunity to see information repeatedly, and the presence or absence of stress or distractions. After reviewing the information in this case, Dr. Neuschatz's opinion was that the presence of a gun and the fact that the Defendant's head and face were covered could have negatively affected the victims' memory.

Additionally, seeing the Food City surveillance recording did not impact the photographic lineups, but it could have impacted the victims' memory of events, including the victims' in-court identification of the Defendant. Dr. Neuschatz noted that

if A.R. were told she had picked the right person out of a lineup, even if the perpetrator's photograph did not appear in the lineup, it would have reinforced her belief she was right. Dr. Neuschatz stated if a witness testified in court months after the event that she was one hundred percent certain her identification of a suspect was correct, "there's no relation there between confidence and accuracy." However, a witness's statement of confidence shortly after an incident correlated with accuracy.

Four characteristics of an unbiased lineup were (1) proper instructions, including the statement that the perpetrator may or may not be in the lineup; (2) the officer conducting the lineup should not know the identity of the suspect and should communicate that fact to the witness; (3) "filler" photographs matching the description given by the witness; and (4) obtaining a confidence statement from the witness regarding the identification.

Dr. Neuschatz noted that A.R. was properly instructed before the lineup. He noted, "I would say two of [the photographed individuals had] blue eyes for sure." In his opinion, this made the lineup biased.

Relevant to the Sunset Cottage Rentals lineups, Dr. Neuschatz opined that unless a separate officer conducted each of the three lineups, the officer could have influenced the second and third victims with nonverbal cues after seeing the first victim's selection. Dr. Neushatz noted that if the victims spoke to one another after participating in a lineup, this would bias the results of subsequent lineups or other identifications. In addition, if a witness were "shown anything prior to the lineup," it could be a "very large factor."

Dr. Neuschatz opined that the best practice was to record a lineup or to record "all of the aspects, including the confidence statement." He noted that no written confidence statements existed with the lineups in this case. He further noted that the most important factor to accurate identification was the witness's opportunity to see the perpetrator's face. Dr. Neuschatz's opinion of the instant cases was that without a biased lineup, it would have been "very difficult to identify someone when [the individual] do[es]n't get a very good look at their face and it's covered up."

Dr. Neuschatz testified that weapon focus and stress were common factors in violent crime. To his knowledge, no studies existed examining whether distraction due to weapon focus persisted during a longer period of exposure to the weapon. Dr. Neuschatz stated that if a person was known to a witness, the accuracy of the identification was close to one hundred percent. If a witness stated that she was "very confident" in an identification at the time of a lineup, it would be a confident statement. DNA evidence could confirm or disprove a witness identification.

-18-

Barbara Cockrum, the mother of a friend of the Defendant, testified that on October 14, 2014, her daughter and the Defendant were at Ms. Cockrum's house and that the Defendant left the house the next day around 2:30 p.m. On cross-examination, Ms. Cockrum testified that the Defendant left her home on October 15, but on redirect examination, Ms. Cockrum clarified that the Defendant had arrived at her home on October 13 and departed mid-afternoon on October 14.

The Defendant testified and denied all allegations against him. He denied having taken Ms. Dunn's son's airsoft gun. The Defendant identified a nude photograph of him taken by the police after his arrest, which showed some light-colored pubic hair, and he denied ever having shaved his pubic area. He stated, though, that he did not have a lot of body hair in general. The Defendant acknowledged that he had prior convictions for felony theft and burglary of a habitation. The Defendant noted that his father believed he could obtain custody of the Defendant's son if the Defendant were incarcerated, and implied that his "fiancée," who was not Ms. Merry, had opportunity to place the gun in the home where the Defendant was arrested.

Harold Madison, the Defendant's grandfather, testified that he did not recognize the man in the Food City surveillance recording.

## D. <u>Verdict and Sentencing</u>

Following the conclusion of proof, the jury convicted the Defendant of two counts of aggravated rape, four counts of aggravated robbery, and three counts of the lesser-included offense of aggravated kidnapping.

The presentence report reflected that the Defendant had prior Tennessee convictions for felony theft, misdemeanor theft, misdemeanor possession of drug paraphernalia, and passing worthless checks. He also had prior Texas convictions for forgery and felony burglary of a habitation, as well as Oklahoma convictions for felony theft, possession of a firearm as a convicted felon, drug possession, evading arrest, and joyriding.[4] Supporting documentation for the Oklahoma and Texas convictions reflected that the Defendant committed several offenses while on probation.

The Defendant testified and denied having committed the offenses for which he was found guilty. He stated that the victims identified him after his photograph was publicized on the news and that no physical evidence linked him to the crimes. When

---

[4] We note that the presentence report included Georgia and West Virginia convictions for a separate individual with the same name and birth date as the Defendant. The State stipulated that these convictions were listed in error and marked the relevant convictions for the trial court at the sentencing hearing. In addition, certified copies of the Oklahoma and Texas judgments were received as exhibits.

asked whether he was expressing any remorse for the crimes, the Defendant stated, "No, sir. . . . . None of [the jurors] could relate to me . . . . I've got a crooked detective who's been fired . . . [and] then you've got [Detective] Cutshaw, who obviously led these victims into picking me out of the photo lineup." He stated that he blamed former Detective Joyner and Detective Cutshaw for his convictions. He noted that his previous convictions resulted from guilty pleas and said that if he had committed the offenses, he would have pled guilty.

The trial court found relative to the aggravated rape convictions that the Defendant was "much larger, much stronger" than the victims, that the victims' testimony was positive as to his identity, and that the Defendant's cruelty to the victims "shocks the conscience of this [c]ourt." The court found that the Defendant had "stalked" A.R. and A.D.T's business and "set out to prey on" them and that the Defendant had a lengthy criminal record. The court sentenced the Defendant to twenty-five years on each count. The court noted that the Defendant's father was the first to identify the Defendant in the Food City surveillance recording.

Relative to the four counts of aggravated robbery and three counts of aggravated kidnapping in the Sunset Cottage Rentals case, the trial court found that the Defendant moved the victims into a private area and forced two victims to undress. The court found that the Defendant showed no hesitation about committing the offenses and based upon his "extensive" criminal record sentenced the Defendant to twenty years on each count. The court found that the Defendant's prior convictions made him a Range II, multiple offender relative to the Class B felonies.

The trial court found that the Defendant was a dangerous offender whose actions indicated no hesitation about committing crimes where the risk of death or risk to human life was "very high." The court noted, "Any time that you commit offenses like these, you do create a situation, and especially he said he had a gun, and it ended up being . . . an air gun, but these folks didn't know that."

The trial court ordered concurrent sentences on all counts except for the twenty-five-year sentences for aggravated rape, which were ordered to run consecutively and included lifetime community supervision.

At the motion for a new trial hearing, the Defendant argued that he was not a dangerous offender because the airsoft gun had not created a risk of harm. An exhibit was introduced containing the technical specification of the Taurus 24/7 airsoft pistol, which included the weapon's firing velocity of 300 feet per second. Relevant to the trial court's finding the Defendant was a dangerous offender, the court stated, "This man committed, within a very short period of time, crimes against several different people in two separate locations . . . . [H]e had absolutely no hesitation about committing crimes

-20-

that involved a great risk of harm to other people. In fact, he committed great harm to people." The court affirmed its decision to order consecutive service of the sentences for aggravated rape.

The court affirmed its decisions on the remaining issues raised in the motion for a new trial, including suppression and the Ferguson instruction, without further discussion. The court denied the motion. The Defendant timely appealed.

## ANALYSIS

On appeal, the Defendant argues (1) that the trial court erred by denying his motion to suppress the victims' in-court identifications of the Defendant; (2) that the State committed a Ferguson violation by failing to preserve the identity of the witness who told an unidentified Pigeon Forge police officer she saw a person fitting the suspect's description run in a certain direction, thereby requiring a limiting instruction to the jury; (3) that relative to the imposition of consecutive sentences for aggravated rape, the trial court failed to make appropriate findings that the Defendant was a dangerous offender pursuant to Wilkerson; and (4) that the cumulative effect of these errors deprived the Defendant of a fair trial.

## I

### In-Court Identification

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)).

It has long been recognized that "in-court identifications have little testimonial force in view of the fact that the witness is likely to always identify the person at the defense table." Watts v. State, 638 S.W.2d 938, 942 (Tex. Ct. App. 1982). As such, the

general rule "is that an in-court identification is inadmissible [only] if it was tainted by an unconstitutional pretrial identification." State v. Davis, 872 S.W.2d 950, 956 (Tenn. Crim. App. 1993).

A witness's identification of a defendant in a photographic lineup must be suppressed pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); see State v. Martin, 505 S.W.3d 492, 500 (Tenn. 2016). "The United States Supreme Court has emphasized that 'due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary,' and only if the eyewitness's identification 'is tainted by police arrangement.'" Martin, 505 S.W.3d at 500 (quoting Perry v. New Hampshire, 565 U.S. 228, 238 (2012)).

In determining whether an identification procedure violated a defendant's due process rights under the Simmons standard, in Neil v. Biggers, 409 U.S. 188, 198-99 (1972), the Court established "a two-part analysis to assess the validity of a pre-trial identification." State v. Richard Perkinson, No. E2008-01180-CCA-MR3-CD, 2009 WL 865339 (Tenn. Crim. App. March 26, 2009). In accordance with the two-part test, if we conclude that the identification procedure was suggestive, we must then determine whether the identification was reliable despite the fact that it was inherently suggestive. Biggers, 409 U.S. at 199. In determining whether the identification was reliable, we must consider the following five factors:

> [T]he opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation.

Id. at 199-200. A conviction based on a flawed identification procedure will be reversed only when the procedure utilized in the defendant's case "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384 (1968).

### A. A.R.'s identification

The Defendant contends that A.R.'s lineup was impermissibly suggestive because only two of the six photographs featured individuals with blue eyes and the other individual with blue eyes had "bags" under his eyes. The State responds that the

evidence does not preponderate against the trial court's finding the lineup was not suggestive. We agree with the State.

Detective Cutshaw testified at the suppression hearing that four and perhaps five of the six individuals in the photographic lineup had blue eyes. The testimony upon which the Defendant relies was presented during the trial by defense expert Dr. Neuschatz. In any event, a close examination of the lineup reveals at least four individuals with blue eyes, which is consistent with Detective Cutshaw's testimony. The individuals in the lineup had the same general features, and the factual basis of the Defendant's argument is not supported by the record. The evidence does not preponderate against the trial court's finding the lineup was not suggestive. Having concluded that the lineup was not suggestive, we need not consider the five Biggers factors for reliability. Because A.R.'s pretrial identification was not improper, her in-court identification was likewise properly admitted. The Defendant is not entitled to relief on this basis.

## B. Sunset Cottage Rentals identifications

The Defendant contends that C.L., C.B., and D.F.'s in-court identifications were impermissibly tainted by viewing the Food City surveillance video or still photographs after completing the photographic lineup, which served to "confirm" the victims' lineup selection. The State responds that the procedure was not suggestive. We agree with the State.

The Defendant bases his argument on this court's opinion in State v. Dominic Lyons, No. M2012-01635-CCA-R9-CD, 2013 WL 1858779 (Tenn. Crim. App. May 2, 2013). In that case, the witness to a drive-by shooting at a nightclub did not identify a suspect in a photographic lineup. Id. at *1. The witness maintained she was shown multiple photographic arrays. Id. At *6. Other witnesses had identified the defendant as having argued with club security but had not identified him as the shooter. Id. at *6. A police detective was certain the witness was lying and called her to the police department three weeks later. Id. at *1. In a recorded interview, the detective told the witness that he thought she "got a pretty decent look at the guy" and that she had failed to identify the "target subject [police] were looking at." Id. at *3. The witness responded that after thinking it over, the "number that [she could] think of . . . [was] four." Id. The detective left to retrieve the lineup, and a second detective told the witness that she was "the best witness" and that she had already identified "the guy that argued [with club security] was the shooter." Id. The second detective told the witness "it was important for her to make an identification because 'he may do it again and it may be you.'" Id.

The first detective returned and showed the witness the photographic array

containing the defendant's photograph, which was in the same position, number four, as the first time she saw it, and she chose the defendant's photograph. Id. The second detective "confirmed that other information indicated" the defendant's guilt and that the defendant "had been trying to apologize" for shooting the witness's friend. Id.

The trial court determined, and this court affirmed, that the procedure following the initial lineup was unduly suggestive. The witness was informed that the suspect's photograph was included in the array, she was shown the same array twice with the defendant's photograph in the same position, and she was told she chose correctly after the second lineup. Id. at *8.

After a thorough review of the record in this case and applicable case law, we conclude that the recording and still photograph were not unduly suggestive under the circumstances of this case, which is distinguishable from Lyons. The victims had already positively identified the Defendant in the photographic lineup before viewing the photograph or recording. Detective Joyner did not make any statements to the victims confirming their choice in the lineup, the photograph, or the recording.

Although the trial court did not make specific findings regarding whether viewing the recording and photograph were suggestive, it considered the Biggers factors and concluded that in the totality of the circumstances, the victims' identifications of the Defendant "were not the result of any inappropriate lineup." The court found that the victims were in very close proximity to the Defendant during the robbery and had the opportunity to see his features. The victims' first lineup identification was "made promptly," and the victims' level of certainty was "pretty high[.]" The court further found that "any errors, if any, made in showing [the victims] the single photograph and/or the video [did not detract] from their identification." The record does not preponderate against the court's findings.

Further, the recording and photograph were shown to the jury, and the jury had ample opportunity to assess the reliability of the subsequent identifications. We note that there was extensive proof of identity given in this case aside from the in-court identifications, including the four lineups, Mr. Atha's identification of the Defendant in the Food City surveillance recording, the consistent contemporaneous victim descriptions of the Defendant's clothing and general physical characteristics, testimony regarding the Defendant's distinctive gait, testimony regarding the airsoft gun, the Food City surveillance recording itself, and the similarities between the two crimes. The jury, by its verdict, credited the victims' statements that they were certain the Defendant was the person who robbed them. The Defendant is not entitled to relief on this basis.

-24-

## II

## Alleged <u>Ferguson</u> Violation

The Defendant argues that the trial court erred by declining to give a limiting instruction to the jury regarding the State's duty to preserve the identity of a witness who spoke to police after the Sunset Cottage Rentals robbery. The State responds that the Defendant failed to show the exculpatory value of the evidence and that that the Defendant received a fair trial without the limiting instruction. We agree with the State.

As a preliminary matter, we note that the Defendant's motion for a new trial does not include a <u>Ferguson</u> issue regarding the identity of the witness.[5] However, the issue was addressed and discussed at the motion for a new trial hearing. Tennessee Rule of Criminal Procedure 33(b) states, "A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Because this issue was not reduced to writing in the motion for a new trial, this issue has been waived. We will, however, examine the issue for plain error.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

<u>State v. Page</u>, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting <u>State v. Terry</u>, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." <u>Id.</u> at 231.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution provide every defendant the right to a fair trial. To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment. <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963). Further, the prosecution has a duty to turn over exculpatory evidence that

---

[5] The motion did include an issue regarding lost text messages from A.D.'s cell phone, which has not been raised on appeal.

would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97, 110-11 (1976).

In State v. Ferguson, 2 S.W.3d at 916, our state supreme court adopted a test for courts to use in determining whether the State's loss or destruction of evidence deprived a defendant of a fair trial. The first step in analyzing whether a defendant's trial was fundamentally fair "is to determine whether the State had a duty to preserve the evidence." Id. at 917. The State's duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 917. This "materiality" standard requires proof that the evidence possesses an exculpatory value apparent prior to the destruction of the evidence and must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. In some circumstances, the State's failure to preserve the identity of a witness can be material to the defense. See State v. Steven O. Hughes-Mabry, No. E2011-02255-CCA-R3-CD, 2013 WL 4046466, at *16-17 (Tenn. Crim. App. May 16, 2013). In Hughes-Mabry, a Ferguson violation occurred when officers failed to obtain and preserve identifying information for a man who was stopped by police and separated from the Defendant during a suspected drug deal. This Court concluded that the State had a duty to preserve the evidence because

> [n]ot only was this unidentified white male interviewed, but evidence obtained during the search of this man was used against the Defendant at trial. Moreover, based upon the facts as they developed, this individual could have likewise been charged as a participant in the attempted deal at the gas station. Clearly, the identity of this individual was material to the defense.

Id. at *18.

In this case, the witness at issue was an unnamed woman on a hotel balcony on River Road near Sunset Cottage Rentals. She told an unidentified police officer that she saw a man wearing a navy blue hooded sweatshirt and blue jeans running toward a campground.[6] At trial, Officer Hilty testified that his police dog tracked a suspect to the river opposite the campground and that no suspect was apprehended as a result of the tracking. None of the evidence presented at trial was obtained from speaking to the woman. Her description of the man she saw fleeing was not more detailed than that of the victims, and the Defendant's assertion that the woman may have been able to identify that the Defendant was not the man she saw is speculative at best. As previously stated by this Court, the fact "that the State should have collected more evidence because that

---

[6] There is some indication in the transcript of the police radio chatter that multiple bystanders may have been present, but an officer stated that "she" gave a description of the suspect.

evidence <u>might have been</u> exculpatory . . . is not the standard required for the giving of an instruction under <u>Ferguson</u>." <u>State v. Bufford</u>, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at \*13 (Tenn. Crim. App. May 20, 2014) (emphasis in original). The State had no duty to collect the woman's identifying information in this case. In addition, we note that extensive identity testimony was presented at trial and that the sufficiency of the evidence regarding identity is not at issue. The Defendant is not entitled to relief on this basis.

## III

## Consecutive Sentencing

The Defendant contends that the trial court abused its discretion by imposing consecutive sentences relative to the aggravated rape convictions. The Defendant argues that the trial court did not make adequate findings before applying Tennessee Code Annotated section 40-35-115(b)(4) and finding the Defendant was a dangerous offender. <u>See</u> <u>State v. Wilkerson</u>, 905 S.W.2d 933 (Tenn. 1995). The Defendant also argues that because he used an airsoft gun, the risk to human life was not high. The State responds that the trial court did not abuse its discretion in imposing consecutive sentences and that the court's findings were sufficient to establish the requirements set out by <u>Wilkerson</u>.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." <u>State v. Pollard</u>, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." <u>Id.</u> at 862 (citing <u>State v. Dickson</u>, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. <u>See</u> Tenn. Code Ann. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis of the dangerous offender category, it must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." <u>Wilkerson</u>, 905 S.W.2d at 939. The trial court must make specific findings about what "particular facts" show that the <u>Wilkerson</u> factors apply to the defendant. <u>State v. Lane</u>, 3 S.W.3d 456, 461 (Tenn. 1999).

-27-

In this case, the trial court did not make the findings required by Wilkerson. Relative to the dangerous offender classification, the court stated only that "[a]ny time that you commit offenses like these, you do create a situation, and especially he said he had a gun, and it ended up being . . . an air gun, but these folks didn't know that." This statement did not adequately explain the court's reasoning under Wilkerson. The court's sentencing decision, therefore, is not presumptively reasonable. We will review the imposition of consecutive sentences de novo. See Pollard, 432 S.W.3d at 864 (holding that in the absence of Wilkerson findings, appellate courts may conduct a de novo review or remand the case to the trial court).

We conclude that consecutive sentences are warranted due to the Defendant's extensive criminal history, which the trial court correctly found in the context of the length of his sentences. Tenn. Code Ann. § 40-35-115(b)(2). The Defendant's nine felony convictions in the instant case would independently qualify as an extensive criminal history. See, e.g., State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) (holding that relevant to partial consecutive service, a defendant with no prior criminal history had an extensive criminal history due to eight felony convictions in that case).

Moreover, in addition to the felonies in this case, the Defendant had previous convictions in three states for felony theft, misdemeanor theft, misdemeanor possession of drugs and drug paraphernalia, passing worthless checks, forgery, felony burglary of a habitation, possession of a firearm as a convicted felon, evading arrest, and joyriding. We note that the Defendant previously committed several offenses while on probation. His behavior escalated over time from joyriding and passing worthless checks to violent crimes—aggravated robbery, aggravated kidnapping, and aggravated rapes that occurred under such circumstances to "shock the conscience of" the trial court. Consecutive service of the aggravated rape sentences is amply merited in this case. The Defendant is not entitled to relief on this basis.

## IV

## Cumulative Error

The Defendant contends that he is entitled to a new trial based upon cumulative error. The State responds that the Defendant has not shown multiple errors occurred and, therefore, is not entitled to relief based upon a theory of cumulative error.

The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State

v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Here, the Defendant has failed to establish that "more than one actual error [was] committed in the trial proceedings." Id. at 77. Accordingly, we conclude that this issue is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE